IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Tiara Burks,                                          :                    Case No. 1:12 CV 1408

      Plaintiff,                                  :

v.                                                        :

Commissioner of Social Security,        :                    **MEMORANDUM AND
ORDER**

      Defendant.                                :


## I.  INTRODUCTION.

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant's final determination denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1).  Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 17).  For the reasons that follow, this case is remanded to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g).

## II.  PROCEDURAL BACKGROUND.

Plaintiff filed applications for SSI and DIB on January 27, 2005, alleging that she was disabled as of January 21, 2005.  The applications were denied initially and upon reconsideration

(Docket No. 10, pp. 98-99; 103-105; 142-143; 145-146 of 437).  Plaintiff filed applications for SSI and DIB on August 9, 2007, alleging that she was disabled as of March 1, 2007.  The record does not provide documents that show whether the claims were denied initially or upon reconsideration (Docket No. 10, pp. 147-148; 150-151 of 437).  Plaintiff protectively filed applications for DIB and SSI on March 10, 2008, alleging that she was disabled as of March 1, 2007.  The applications were denied initially and upon reconsideration (Docket No. 10, pp. 63-65; 66-68; 70-72; 74-76; 77-79; 81-84; 154-155; 159-160 of 437).

On March 3, 2009, Plaintiff filed a timely written request for a hearing.  Administrative Law Judge ("ALJ") Rafael Lugo-vilanova conducted a video hearing on September 3, 2010, at which Plaintiff, represented by counsel, and Vocational Expert ("VE") Herman Litz appeared at the hearing site in Cleveland, Ohio, and the ALJ presided over the hearing from Houston, Texas (Docket No. 10, pp. 34-58; 83-84 of 437).  ALJ Lubo-vilanova issued an unfavorable decision on September 22, 2010, determining that Plaintiff was not disabled under Sections 216(i), 223(d) and 1614(a)(3)(A) of the Act (Docket No. 10, pp. 16-18; 19-28 of 437).  The Appeals Council denied review of the ALJ's decision on April 19, 2012, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 10, pp. 5-8 of 437).  On June 5, 2012, Plaintiff filed a Complaint in the United States District Court for the Northern District of Ohio seeking judicial review of the denial of her claims for DIB and SSI (Docket No. 10, pp. 5-8 of 437; Docket No. 1).

### III.  THE ADMINISTRATIVE HEARING.

**1.**     **PLAINTIFF'S TESTIMONY**.

At the time of the hearing, Plaintiff was a twenty-five-year-old single mother.  After completing the tenth grade in special education classes, Plaintiff received neither educational, on-

the-job nor vocational training.  While she lived in an apartment on her own in the past, her social worker at Connections Community Support Programs ("Connections"), Keisha Payne, felt that she should not live alone.  Accordingly, Plaintiff lived with her mother (Docket No. 10, pp. 37; 38; 45-46; 50-51; 55 of 437).

Plaintiff was unable to read and comprehend a newspaper article but she had basic applied mathematic skills.  Her inability to remember what she spent created considerable difficulty with managing her bank account (Docket No. 10, pp. 38, 45, 46, 47, 48 of 437).  However, since 2006, Plaintiff had been assigned a social worker from Connections who assisted her with life management skills such as budgeting, shopping, reading and understanding written communications (Docket No. 10, pp. 46, 47 of 437).  Plaintiff's mother supplemented the assistance provided by the social worker in matters of budgeting, managing finances, child care and making applications for jobs (Docket No. 10, pp. 47-48 of 437).  She was always accompanied by a friend and cousin when visiting the mall (Docket No. 10, p. 55 of 437).

Plaintiff denied having a driver's license for the reason that she could not pass the written part of the examination.  When confronted by the ALJ about whether she drove to a psychological test that was performed a couple of years prior by herself, Plaintiff explained that "she was with her social worker" when she went to take the psychological test (Docket No. 10, pp. 54-55 of 437).

In establishing her past relevant work history, Plaintiff indicated that generally she had worked as a cafeteria assistant, cashier, stock clerk and most recently doing housekeeping.  For approximately eleven months of work in 2009, Plaintiff earned $9,490.19 as a housekeeper.  Plaintiff was discharged from this job due to an inability to follow instructions (Docket No. 10, pp. 38-39; 49-50 of 437).

At the end of 2009, she worked for four months as a part-time home health aide.[1]  She performed this job in a seated position (Docket No. 10, pp. 43, 44, 45 of 437).

From 2005 to 2007, Plaintiff was employed as a stock clerk in various retail stores.  In this capacity, she placed items on shelves and could lift items weighing more than twenty pounds. Plaintiff indicated that she was seated for part of the shift as a stock clerk.  She could not recall when her job as a stock clerk ended (Docket No. 10, pp. 39, 40, 41 of 437).

Plaintiff's work records showed that from January 2005 through December 2005, she worked as a cafeteria assistant in a large government agency.  Plaintiff helped make pizzas which required her to stand during most of her shift (Docket No. 10, pp. 39-40, 42 of 437).

Plaintiff does not allege any physical disability, only psychologically-based disorders for which she was undergoing psychiatric treatment at Connections.  Diagnosed with a bipolar disorder and attention deficit hyperactivity disorder (ADHD), Plaintiff suffered numerous symptoms which included acting out in either a verbal or physical manner at family, strangers or co-workers.  She noted a correlation between this behavior and the reprimands and the discharge from her employment (Docket No. 10, p. 48 of 437).

Plaintiff stated that she had never been admitted to a psychiatric unit but she was taking Seroquel, Lexapro and Lamictal, the combination of which provided symptomatic treatment for sleep and depressive disorders (Docket No. 10, p. 50 of 437).  The negative side effects of these medications included real "bad" headaches and difficulty sleeping throughout the entire night

---

[1]

Because this job was not performed over a significant period of time, the ALJ determined that it did not reach the "substantial gainful activity" level.  Substantial gainful activity is work which involves doing significant and productive physical or mental duties for pay or profit.  The specified dollar amount is updated annually to reflect inflation, and it represents the minimum level of employability which will render a person productive and, therefore, ineligible for Social Security benefits.  20 C. F. R. §§ 404.1560, 416.910, 404.1574(b)(2), 416.974(b)(2) (Thomson Reuters 2013).

(Docket No. 10, p. 51 of 437).

In a typical day, Plaintiff stated that she was awakened at 8:00 A.M., occasionally made breakfast, got her daughter ready for school and cleaned "around" the house.  Plaintiff stated that she "sometimes" remained at home and occasionally, she would keep her appointments without supervision from the social worker.  Plaintiff further stated that while she believed she could look at a bus schedule to get across town, she has never done so since she had the assistance from her social worker (Docket No. 10, pp. 52, 53 of 437).

2.      VE's TESTIMONY

The VE classified Plaintiff's past relevant work as cafeteria assistant and stock clerk, both considered light in exertional level and unskilled.  Both jobs had a Specific Vocational Preparation (SVP) of two.  SVP is the amount of time required by a typical worker to acquire the information and skills necessary for average performance in a specific employment and a level of two denotes anything beyond short demonstration up to and including one month (Docket No. 10, p. 56 of 437; http://www.onetonline.org/help/online/svp)

The ALJ posed the following hypothetical question:

So if I were looking for very simple type of work, those would be also an example of very simple type of work?

The VE responded affirmatively (Docket No. 10, p. 56 of 437).

The ALJ posed a second hypothetical question/statement:

Of course if I were to ask the vocational expert a question based on Exhibit 16[2], the

---

[2]

Exhibit 16F is an assessment of Plaintiff's capabilities to perform basic mental activities of work on a sustained basis, defined as 40 hours per regular work week.  Sandra L. Kimble, a certified registered nurse practitioner, opined that Plaintiff, generally, had significant limitations in the ability to make occupational adjustments and make personal and social adjustments.  She had moderate limitations in her ability to use her judgment, interact with supervisors, understand, remember and carry out simple job instructions, maintain appearances and leave home on her own (Docket

[INAUDIBLE], by Sandra Kimble [certified registered nurse practitioner], the claimant would not be able to work.

The VE once again answered affirmatively (Docket No. 10, p. 57 of 437).

### IV.  MEDICAL RECORDS

On February 3, 1995, an evaluation team at the East Cleveland City Schools, consisting of four psychologists, two speech pathologists and a school administrator, reviewed Plaintiff's educational program options.  The Wechsler Intelligence Scale for Children-III (WISC-III)[3] and Vineland Adaptive Behavior Scales (VABS)[4] were administered.  Results from the WISC-III, Plaintiff achieved a full scale intelligence quotient of 65, a verbal score of 70 and a performance score of 66.  Results from the VABS, showed a composite score of 69, which the psychologist's equated with functioning within the developmentally handicapped range of adaptive behavior.  The evaluation team noted that Plaintiff was on task but having great difficulty with social studies; that she was not aware of how difficult some of the tasks were for her; that she had difficulty with sight reading; and that she had not mastered multiplication and subtraction functions.  The evaluation team concluded that Plaintiff functioned within the developmentally disabled range of cognitive and academic behaviors (Docket No. 10, pp. 269, 279, 281, 283, 284, 286, 287 of 437).

Two days later at another educational institution, an evaluation team comprised of an administrator, classroom teacher and psychologist, administered the WISC-III test.  Plaintiff

---

No. 10, pp. 432-433 of 437).

[3]

WISC-III measures intelligence scores and provides essential information and critical insights into the child's cognitive functioning.  Www.pearsonassessments.com.

[4]

The Vineyard Adaptive Behavior Scale measures personal and social skills needed for everyday living. http://psychcorp.pearsonassessments.com).

achieved the same scores:  a full scale score of 65, a verbal score of 70 and a performance score of 66.  The team concluded that Plaintiff's performance on this test was indicative of a child who met the special education criteria.  There were no significant changes in behavior or educational functioning.  Her strongest academic skills appeared in math reasoning and her weakest skills appeared in math calculation.  Generally, Plaintiff had deficits in the areas of communication, daily living and socialization (Docket No. 10, pp. 269, 270, 271 of 437).

A special education case manager and administrator re-evaluated Plaintiff on August 7, 1999 and determined that Plaintiff met the criteria for special education.  She was clearly functioning below grade level in all academic areas.  Her strengths were in math reasoning and her weaknesses were in math calculation (Docket No. 10, pp. 275, 276 of 437).

On June 15, 2007, Plaintiff underwent an eligibility determination for services through the Ohio Department of Mental Retardation and Disabilities.  Based on a multi-factored assessment which included an evaluation completed in December 2005, the evaluator determined that Plaintiff's mental impairment manifested before age 22 and the mental impairment was likely to continue indefinitely (Docket No. 10, p. 268 of 437).

Dr. Vicki Casterline, Ph. D., completed the MENTAL RESIDUAL FUNCTIONAL CAPACITY on September 27, 2007.  Based on evidence in the file, Dr. Casterline evaluated Plaintiff's mental activities within the context of her capacity to sustain activity over a normal workday and workweek on an ongoing basis.  Dr. Casterline opined that Plaintiff had no history of mental health treatment and was able to comprehend, remember and carry out simple task instructions, she could relate appropriately to others and she could adapt to a static work setting in which duties are routine and predictable and changes can be explained.  At most, Plaintiff had moderate limitations in the ability

to understand and remember detailed instructions, carry out detailed instructions and respond appropriately to changes in the work setting (Docket No. 10, pp. 295-297 of 437).

Dr. Casterline competed a PSYCHIATRIC REVIEW TECHNIQUE on September 27, 2007 for the period of March 1, 2007 through September 27, 2007.  Under Listing 12.05, Dr. Casterline found that Plaintiff had a medically determinable impairment that was present but it did not satisfy the diagnostic criteria of the Listing, namely, she had a borderline intellectual functioning disorder.  The degree of functional limitation resulting from this mental impairment was as follows:

| FUNCTIONAL LIMITATION | DEGREE OF LIMITATION |
|---|---|
| 1.   Restriction of Activities of Daily Living   Mild | |
| 2.   Difficulties in Maintaining Social Functioning | Mild |
| 3.   Difficulties in Maintaining Concentration, Persistence or pace | Moderate |
| 4.   Episodes of De-compensation, each of extended duration | None. |

(Docket No. 10, pp. 299-311 of 437).

On October 29, 2007, Plaintiff presented to the University Hospital of Cleveland Emergency Room (UHCER) with chest pain on her left side.  She was diagnosed with chest wall strain, and Motrin was prescribed to relieve her symptoms (Docket No. 10, pp. 327-336, 339-340 of 437).

On November 9, 2007, Plaintiff was treated at UHCER for abdominal cramps that had persisted for three days.  She was diagnosed with bacterial vaginosis, for which antibiotics were prescribed (Docket 10, pp. 316-326, 337-338 of 437).

Plaintiff underwent an initial psychiatric evaluation at Connections on February 27, 2008, during which a Dr. Nelson completed the five axis model designed to provide a comprehensive diagnosis that includes the complete picture of Plaintiff's mental health:

| | | |
|---|---|---|
| 1. | Axis I | Bipolar disorder II |
| 2. | Axis II | History of borderline intellectual functioning. |

8

| 3. | Axis III | None |
| 4. | Axis IV | Single parent |
| 5. | Axis V | Global Assessment of Functioning[5] --60 or the presence of moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). |

Dr. Nelson recommended that deficit hyperactivity disorder (ADHD) be ruled out (Docket No. 10, pp. 343-351 of 437).

Plaintiff underwent endocervix curettage on March 24, 2008.  No significant pathologic findings were made (Docket No. 10, p. 431 of 437).

On May 14, 2008, Dr. Herschel Pickholtz, a psychologist, conducted a clinical interview, during which he performed a mental status evaluation and administered the Wechsler Adult Intelligence Scale-III (WAIS-III)[6] and the Wechsler Memory Scale (WMS)[7].  He opined that the raw scores on the WAIS-III were miscalculated as a result of Plaintiff's selective levels of motivation and the scores were inconsistent with her functional abilities.  Her scaled scores in arithmetic, block design, comprehension, digit symbol-coding, information, picture completion, picture arrangement, matrix reasoning and vocabulary were all deficient.  The WMS test results showed inconsistencies with Plaintiff's ability to care for her daughter appropriately and remember what to do to care for her daughter and herself.  The results were, in Dr. Pickholtz's opinion, underestimates secondary

---

[5]

Global Assessment of Functioning or GAF is a scale used to assess psychiatric status, ranging from 1 (lowest level of functioning) to 100 (the highest level of functioning) measuring psychologic, social and occupational functioning.  Http://medical-dictionary.thefreedictionary.com.

[6]

In recognition of emerging demographic and clinical trends, the WAIS IV was developed to provide the most advanced measure of cognitive ability and results you can trust when addressing the changing clinical landscape in adults.  Http://pearsonassessments.com.

[7]

WMS is the most widely used scale of adult memory.  Http://www.pearsonassessments.com.

to some selective levels of motivation (Docket No. 10, pp. 357-359 of 437).

Correlating her background information and mental status, Dr. Pickholtz made several concluding observations, notably that Plaintiff identified herself with a valid driver's license; that she completed the 11th grade and was in special education classes geared toward the learning disabled; that she could not work because of learning problems and ADHD; that her affect approximated the average range and her mood was appropriate; and that there were no significant signs of autonomic anxiety.  Dr. Pickholtz observed that Plaintiff was not preoccupied with religion and there were no signs of suspiciousness, hostility or aggression.  Plaintiff denied visual hallucinations but claimed that she "used" to hear noises in her home (Docket No. 10, pp. 353-357 of 437).

Dr. Pickholtz estimated that Plaintiff's true levels of intellectual functioning and memory approximates the borderline ranges of functioning and her overall abilities for independence and adaptation as well as taking care of herself and her daughter are inconsistent with true mild mental retardation and consistent with at least borderline levels of intellectual functioning.  Observing no severe signs of an ADHD at the time of the evaluation, Dr. Pickholtz made the following findings in the four work related areas:

| MENTAL FUNCTIONAL LIMITATION | DEGREE OF LIMITATION |
|---|---|
| 1. Ability to understand and follow instructions | Moderate range of impairment |
| 2. Ability to maintain attention and to perform simple repetitive tasks based on overall pace and persistence | Mild range of impairment |
| 3. Ability to maintain attention and to perform simple repetitive tasks | Mild range of impairment |
| 4. Ability to withstand the stresses or pressures associated with day-to-day work activities relative to low skilled and unskilled labor with her appropriate medications | Moderate range of impairment. |

(Docket No. 10, pp. 359, 360 of 437).

10

Under the five axis model designed to provide comprehensive diagnoses that include the complete picture of Plaintiff's mental health, Dr. Pickholtz found:

| | | |
|---|---|---|
| 1. | Axis I | Bipolar disorder, involving some depression and agitation without any signs of psychotic processing and her current medications were mild at best. ADHD, which appears to be mild at worst. |
| 2. | Axis II | Borderline intellectual functioning<br>Mixed personality involving some narcissistic and passive/aggressive features. |
| 3. | Axis III | No major complaints at this time |
| 4. | Axis IV | Moderate psychosocial stressors such as occupational problems and psychosocial stressors related to her residual affective difficulties. |
| 5. | Axis V | GAF of 55 denotes the presence of moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). |

In summary, Dr. Pickholtz opined that the impact of Plaintiff's psychiatric complaints relative to thinking, memory, and pace and persistence, fell within the mild range of impairments and suggested much higher levels of intellectual functioning and memory than were noted across testing.  In other words, Dr. Pickholtz was persuaded that Plaintiff had some tendencies toward exaggeration since her overall abilities in terms of comprehending what she read, driving, caring for her daughter, relating to others, performing her chores as needed, understanding movies and generally acting independently, all placed her in the moderate range of impairment (Docket No. 10, p. 361 of 437).

Dr. Frank Orosz, Ph. D., performed a PSYCHIATRIC REVIEW TECHNIQUE for the period of May 1, 2007 through July 1, 2008, finding that Plaintiff had borderline intellectual functioning, ADHD, a bipolar affective disorder and a mixed personality disorder.  None of these impairments satisfied the diagnostic criteria of the Listings.  The degree of limitation that exists as a result of Plaintiff's mental disorders was:

**FUNCTIONAL LIMITATION**                                    **DEGREE OF LIMITATION**

11

| | | | |
|---|---|---|---|
| 1. | Restriction of Activities of Daily Living | Mild | |
| 2. | Difficulties in Maintaining Social Functioning | | Moderate |
| 3. | Difficulties in Maintaining Concentration, Persistence or pace | | Moderate |
| 4. | Episodes of De-compensation, each of extended duration | | None. |

(Docket No. 10, pp. 363-373 of 437).

In the mental residual functional capacity for the same period, Dr. Orosz opined that Plaintiff was moderately limited in the ability to:

1.  Understand and follow instructions.
2.  Carry out detailed instructions.
3.  Sustain an ordinary routine without special supervision.
4.  Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
4.  Interact appropriately with the general public.
5.  Respond appropriately to changes in the work setting.

(Docket No. 10, pp. 377-381 of 437).

At Connections, Plaintiff underwent several somatic counseling sessions.  On March 19, 2008, Plaintiff had forgotten to take the Lamictal for three days and the prescription was refilled. On April 16, 2008, a prescription for Seroquel was added to assist with sleeplessness.  There were no hallucinations, delusions or other concerns.  By July 9, 2008, it was obvious that Plaintiff needed more therapeutic intervention because she was forgetting to take her pills.  Plaintiff reported that she was medication compliant on August 6, 2008.  There were no hallucinations, delusions or other concerns.  Plaintiff continued to be compliant on September 3, 2008 even though the medication caused nausea.  On December 17, 2008, Plaintiff reported that she was euthymic on Lamictal so Seroquel was restarted.  A prescription for Seroquel was continued on April 27, 2009 because Plaintiff had exhausted her medications in March 2009.  Plaintiff was discharged on December 18, 2009 for the reason that she did not return for services; however, on July 28, 2010, Plaintiff returned

12

for treatment.  Recently evicted and in a depressed mood, Plaintiff was started on Lexapro, an antidepressant (Docket No. 10, pp. 383-392, 394-403 of 437).

On February 15, 2010, Plaintiff presented to Marymount Hospital, complaining of lower abdominal pain.  She was treated for female urogenital problems with anti-bacterial and pain medication (Docket No. 10, pp. 404-416 of 437).

After being physically attacked, on May 10, 2010, Plaintiff presented to UHCER, complaining of lower back and wrist pain.  There was minor trauma to the spine, wrist and forearm. A narcotic pain reliever was prescribed (Docket No. 10, pp. 417-427 of 437).

The actual ratings from Ms. Kimble's assessment of Plaintiff's capabilit**e**s to perform basic mental activities of work on a sustained basis completed conducted on July 28, 2010, were:

### FAIR TO POOR

1. Maintain attention and concentration for extended periods of two-hour segments
2. Respond appropriately to changes in routine settings
3. Maintain regular attendance and be punctual within customary tolerances
4. Deal with the public
5. Relate to co-workers.
6. Deal with work stresses.
7. Socialize.

### POOR

1. Function independently without special supervision
2. Work in coordination with or proximity to others without being unduly distracted or distracting.
3. Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
4. Understand, remember and carry out complex job instructions.
5. Understand, remember and carry out detailed, but not complex instructions.
6. Behave in an emotionally stable manner
7. Relate predictably in social situations.
8. Management of funds/schedules.

### GOOD TO FAIR

13

1.      Follow work rules.
2.      Use judgment.
3.      Interact with supervisor.
4.      Understand, remember and carry out simple job instructions
5.      Maintain appearance.
6.      Ability to leave home on her own.

(Docket No. 10, pp. 432-433 of 437).

## V. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Colvin, 475 F. 3d at 730. (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show she suffers from a "severe impairment."  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.* (*citing Abbott*, 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if she is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the

14

requirements of a "listed" impairment.  *Id*.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity.  20 C.F.R. §§ 404.1520(e), 416.920(e).  An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities –what the individual can or cannot do despite his or her limitations."  *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a).  It "is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule."  *Id*. at *17 (*quoting* ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).  The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If she does, the claimant is not disabled.  Finally, even if the claimant's impairment does prevent her from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that she can perform.  *Colvin*, *supra*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)).  A dispositive finding by the Commissioner at any point in the five-step process terminates the review.  *Id.* (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V.  THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, the ALJ made

the following findings:

1.  Plaintiff meets the insured status requirements of the Act through March 31, 2009.
2.  Plaintiff has not engaged in substantial gainful activity since March 1, 2007, the alleged onset date.
3.  Plaintiff has the following severe impairments: (1) bipolar affective disorder, (2) Attention Deficit Disorder (ADD) and (3) borderline intellectual functioning.
4.  Plaintiff does not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C. F. R. Part 404, Subpart P, Appendix 1.
5.  After careful consideration of the entire record, the ALJ finds that Plaintiff had the residual functional capacity to perform a full range of light work (lift 20 pounds occasionally, lift and carry 10 pounds frequently, stand and walk six hours, and sit occasionally in an 8-hour day) and defined in 20 CR 404.1567(b) and 416.967(b). Additionally, Plaintiff is able to understand, remember, and carry out short and simple instructions.
6.  Plaintiff is capable of performing past relevant work as a cafeteria assistant/stock clerk, work that did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.
7.  Plaintiff was not under a disability, as defined in the Act from March 1, 2007, through the date of this decision.
8.  Based on the application for a period of disability and DIB protectively filed on March 10, 2008, Plaintiff is not disabled under Sections 216(j) and 223(d) of the Act.
9.  Based on the application for SSI protectively filed on February 29, 2008, Plaintiff is not disabled under Section 1614(a)(3)(A) of the Act.

(Docket No. 10, pp. 21-28 of 437).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive. . . ." *Id.* at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance

16

and is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Id.* at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th

Cir. 1992)).    "The findings of the Commissioner are not subject to reversal merely because there

exists in the record substantial evidence to support a different conclusion . . . This is so because there

is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."

*Id.*

at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

Plaintiff presents two issues:

1       Whether Plaintiff's intellectual functioning deficit and residual functional capacity[8] limits meet or equal the disability criteria of Listing 12.05(C)?
2.      Whether substantial evidence supports the ALJ's assessment of Plaintiff's mental residual functional capacity?

In response, Defendant argues:

1.      Substantial evidence supports the ALJ's finding that Plaintiff was not disabled from her alleged mental impairments because contemporaneous evidence of Plaintiff's cognitive functioning confirmed that she functioned in the borderline range.
2.      The ALJ was not obligated to adopt Ms. Kimble's opinions.
3.      The ALJ reasonably accounted for Plaintiff's credibly established mental limitations.

### 1.

Plaintiff argues that the ALJ did not properly consider whether she met or equaled Listing

12.05(C).  Specifically, Plaintiff argues that although the ALJ determined that she had a bipolar

disorder, the ALJ did not consider or reconcile Plaintiff's 1995 full scale IQ scores and any work-

related limitations of function as a result of the bipolar disorder.

---

[8]

Plaintiff's residual functional capacity determination which is material to whether she can engage in any gainful activity, is not material to whether the impairments complained of meet or equal Listing 12.05(C).

Because Plaintiff's argument relies exclusively on Listing 12.05(C), the Magistrate sets forth its controlling requirements and relevant facts.  Generally, impairments listed in Appendix 1 of the regulations are acknowledged by the Commissioner to be of sufficient severity to preclude substantial gainful activity; consequently, a claimant who meets or equals a Listing is conclusively presumed to be disabled and entitled to benefits.

Listing 12.05 states that mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 (Thomson Reuters 2013).  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.  *Id.*

To meet the requirements of Listing 12.05(C), there must be evidence of a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C) (Thomson Reuters 2013).  Listing 12.05(C) further requires that a claimant must satisfy the diagnostic description in the introductory paragraph of 12.05, and both prongs of section (C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) (Thomson Reuters 2013).  If the impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, the Commissioner will find that your impairment meets Listing 12.05.  *Id.*

Thus, to meet Listing 12.05(C), a plaintiff must show:

(1)    significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested before age 22;
(2)    a valid IQ score of 60 through 70; and
(3)    another severe physical or mental impairment.  *Id.*

18

Furthermore, the regulations specify that in cases where more than one IQ is customarily derived from the test administered, the lowest score should be used in conjunction with Listing 12.05. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(c) (Thomson Reuters 2013).

Plaintiff presented probative evidence suggesting that during her developmental period, she tested within the mental retardation range. The written summaries and narratives of structured observations made by the team evaluators which suggested that the onset of Plaintiff's significantly sub-average intellectual functioning occurred during or before her fourth grade year. This team of mental health professionals and educators placed Plaintiff in special education classes because of her overall poor academic performance, inability to make a typical age appropriate progression and deficits in communicating, daily living and socialization. Her fourth grade attendance was poor and her reading ability was on the first grade level and her math calculation ability was at a second grade level (Docket No. 10, pp. 269-288 of 437).

Defendant argues that although the ALJ may not have explicitly evaluated the requirements for determining if Plaintiff met or equaled Listing 12.05, Plaintiff failed to carry the burden of showing how her impairment satisfied the diagnostic description of mental retardation during the relevant time period. In addition, Defendant asserts that this evidence does not assist Plaintiff with her claim that she meets Listing 12.05(C), in part, because her scores were invalid. Defendant also points out that the ALJ was not required to consider these invalid test results for the reason that as a general rule, IQ scores stabilize at age 16. Consequently any scores achieved when Plaintiff was 10 years of age are inherently unreliable.

However, the ALJ did not make an express invalidity finding of the results from the IQ test administered during this developmental period and he cited no legitimate basis or authority for

questioning the validity of the evaluation team's assessment of Plaintiff's IQ score.  The ALJ is silent as to whether he considered the IQ scores in question or disregarded them.  Rather, the ALJ relied on the IQ test derived from tests administered by Dr. Pickholtz.  Admittedly Plaintiff tested within the mild range of mental retardation but Dr. Pickholtz unilaterally discounted these test results, claiming that emotional and motivational factors interfered with her performance on the IQ test.  Dr. Pickholtz determined that Plaintiff's cognitive abilities were within the borderline intellectual functional range, not the mild mental retardation range because Plaintiff had demonstrated an ability to live independently in the community and she possessed skills necessary for minimum self support and the support of her child.

While this Court's review of the evidence may have produced a different result, the standard here requires that if there is substantial evidence supporting the ALJ's decision, such decision is conclusive.  The Magistrate is not persuaded that the tests administered when she was in the fourth grade are invalid simply because Dr. Pickholtz replaced the diagnostic description with his assessment of the IQ test.  Naturally, the ALJ is free to discount any evidence that is not supported by the record; however, the ALJ failed to provide sufficient explanation for whether he even considered the initial IQ test results.

In the absence of findings supported by substantial evidence, the Magistrate cannot assess whether relevant evidence adequately supports the conclusion at step three of the sequential evaluation that Plaintiff's impairments did not meet or equal Listing 12.05(C).  Resolution of conflicts in the evidence is best addressed at the administrative level and not by the Court.  While there is no specific language or format that the ALJ must use in his analysis, his bare conclusion that Plaintiff has failed to demonstrate compliance with Listing 12.05 is beyond meaningful judicial

review.

Remand for further proceedings is particularly appropriate in cases where the ALJ failed to consider certain evidence.  In this case, the ALJ is charged with resolving conflicting evidence in the record and in so doing, the ALJ should consider the directives or policy for invalidating the reports and their narratives.  Additional findings, perhaps expert testimony, or further explanation, may elucidate the rationale for the ALJ's decision.

2.

Plaintiff argues that she had significant mental limitations confirmed by Ms. Kimble, Dr. Pickholtz and Dr. Orosz.  The hypothetical question posed to the VE included an inquiry as to what she could do if restricted to "very simple type of work."  This description "very simple type of work" fails to incorporate Plaintiff's moderate limitations in concentration, persistence or pace, withstand stress and pressure of the day-to-day activity as well as her moderate limitations in the ability to:  (1) sustain an ordinary routine without supervision, (2) complete a normal work day and work week without psychological interruptions, (3) interact appropriately with the general public and (4) respond appropriately to changes in the work setting.

The VE's testimony in response to a hypothetical question may serve as substantial evidence in support of the conclusion that a claimant can perform other work if the hypothetical question accurately portrays a claimant's physical and mental impairments.  *Scott v. Commissioner of Social Security*, 2013 WL 237296, *18 (N.D.Ohio,2013) *adopted by*, 2013 WL 237192 (N.D.Ohio,2013) (*citing Mousseau v. Commissioner of Social Security*, 2012 WL 271379, *5 (E.D.Mich., 2012) *adopted by*, 2012 WL 262559 (E.D.Mich.2012) (*citing Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6thCir.2010)).  There is relevant authority for ordering remand where an ALJ's

hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks.  *Id*. (*citing Benton v. Commissioner of Social Security*, 511 F.Supp.2d 842, 849 (E.D.Mich.2007) (citation omitted)).  However, there is also authority that an ALJ forms an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.  *Id*. (*See, e.g., Hess v. Commissioner of Social Security*, 2008 WL 2478325, at *7–8 (E.D.Mich. 2008) (unreported) (citation omitted)).

Plaintiff relies on *Cheeks v. Commissioner of Social Security,* 690 F.Supp. 2d 592 (E.D.Mich. 2009) and *Ealy v. Commissioner of Social Security,* 594 F. 3d 504 (6th Cir. 2010), both of which analyze the proposition of whether a hypothetical question assuming the ability to perform simple routine tasks in low stress environment fully encompasses non-exertional limitations.  Both of these cases, and the reasons for which they were remanded, are dissimilar and thus distinguishable from the case at bar.  In *Cheeks*, the court considered whether "simple routine tasks" and "a low stress environment," along with the condition that the claimant must work in an atmosphere with "minimal changes," could be read cumulatively to encompass the claimant's non-exertional limitations.  Finding that there was overwhelming support for the conclusion that the claimant's psychomotor impairments warranted mention to the VE, the court determined that the ALJ's failure to address the claimant's pacing limitations was critical given the fact that the VE's job findings consisted exclusively of quota-driven positions.  *Cheeks*, 690 F. Supp. 2d at 602-603.

Moreover, in *Ealy,* the court found that Dr. Scher's conclusions in Section III of the mental residual functional capacity assessment should have been included in the hypothetical question.  The court determined that this description of Ealy's abilities addressed only some of the restrictions,

22

specifically in pace, speed and concentration.  The streamlined hypothetical omitted these speed- and pace-based restrictions completely.  *Ealy*, 594 F.3d at 515.  The court determined that the hypothetical question should have included the limitations addressed in the totality of the mental residual functional capacity assessments.  *Id.*

*Cheeks* and *Ealy* are distinguishable insofar as such limitations were critical to resolving step five of the sequential evaluation, whether Ms. Cheeks and Mr. Ealy could adjust to other work.  Here the VE's services were used merely to determine whether Plaintiff could perform her past relevant work at step four of the sequential evaluation.  Once the VE offered relevant evidence within his expertise or knowledge classifying the physical demands of her past relevant work, the ALJ determined that Plaintiff's residual functional capacity limited her to a full range of light work that was consistent with her past relevant work of cafeteria assistant and stock clerk.  The analysis concluded and a determination was made that Plaintiff was not disabled.  Under the rules, further hypothetical inquiry became unnecessary.

Remand on this issue is of no useful purpose since the ALJ was permitted to rely on the VE's determination at step four of the sequential evaluation, along with other evidence in the record, in determining that Plaintiff could perform her past relevant work.  Having correctly applied the principles of law to the facts, the ALJ's decision is conclusive.

## VIII.  CONCLUSION

For the foregoing reasons, the Magistrate reverses the Commissioner's decision and remands, pursuant to sentence four of 42 U. S. C. § 405(g), this matter to the Commissioner to address the

legal and factual issues arising from whether Plaintiff meets or equals Listing 12.05(C).

      **IT IS SO ORDERED**.

                    /s/Vernelis K. Armstrong
                    United States Magistrate Judge

Date:   May 17, 2013